IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

JUN 2 7 2011

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

**DOUGLAS WOOD,**

      **Plaintiff,**

v.

    **Civil Action No. 2:10CV109**
    **(The Honorable John Preston Bailey)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant, Commissioner of the Social Security Administration ("Defendant," and sometimes "the Commissioner"), denying Plaintiff's claim for disability insurance benefits ("DIB") under Title II of the Social Security Act. The matter is awaiting decision on cross motions for summary judgment[1] and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Gen. P. 86.02.

## I. PROCEDURAL HISTORY

Douglas Wood ("Plaintiff") filed an application for DIB on August 20, 2007, alleging disability since January 31, 2007, due to back pain, pain in both knees, carpal tunnel in both hands,

---

[1]On February 10, 2011, Plaintiff filed a Motion to Enlarge Time for filing his motion for summary judgment, which was due on February 12, 2011 (Docket Entry 11). On February, 11, 2011, the undersigned granted said motion and ordered Plaintiff to file his motion for summary judgment and supporting brief on or before March 15, 2011 (Docket Entry 12). Plaintiff filed a Motion for Summary Judgment and Memorandum in Support of Motion for Summary Judgment on March 17, 2011, two days late (Docket Entries 13 and 14).

depression and hypothyroidism (R. 113, 146). Plaintiff's application was denied at the initial and reconsideration levels (R. 63, 64). Plaintiff requested a hearing, which Administrative Law Judge Randall Moon ("ALJ") held on March 17, 2009, and at which, Plaintiff, represented by counsel, Phillip S. Isner, and Vocational Expert Larry Ostrowski ("VE") testified (R. 18-61). On July 17, 2009, the ALJ entered a decision finding Plaintiff was not disabled (R. 6-17). Plaintiff appealed the ALJ's decision, with the submission of new evidence, to the Appeals Council (R. 5, 107-08).[2] On July 19, 2010, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. STATEMENT OF FACTS

Plaintiff did not finish high school, but he obtained his GED (R. 243). Plaintiff had worked in a warehouse, had unloaded trucks, and was a seasonal farm worker. Plaintiff worked as a telemarketer for eight years, beginning in 1997 (R. 353). Plaintiff was a National Guardsman from 1992 until 1998, when he was medically discharged for a back injury he sustained in 1996. He was a heavy equipment operator in the National Guard (R. 244). Plaintiff was born on November 21, 1968, and was forty (40) years old at the time of the administrative hearing (R. 23).

A September 23, 2003, MRI of Plaintiff's lumbar spine showed it was well aligned with degenerative disc disease involving L3-4, L4-5, and L5-S1, "with disc desiccation and mild loss of normal disc height" (R. 256).

Plaintiff was treated by Physician Assistant Robert Given at the Veteran's Administration Medical Center, in Clarksburg, West Virginia ("VAMC - Clarksburg"), on December 6, 2005, for

---

[2]In his brief, Plaintiff did not argue that the Appeals Council erred in its consideration of the evidence he submitted to it (Exhibits 16F and 17F); therefore, the undersigned does not include a recitation of that evidence in this Report and Recommendation.

"recurrent patellar subluxation of the right knee," chronic back pain, and carpal tunnel syndrome. Plaintiff had completed physical therapy for his knee, which continued to become dislocated at the knee cap and which he corrected by "manually" manipulating it. Plaintiff reported "significant" knee pain (R. 291). P.A. Given continued Plaintiff's prescription for ibuprofen and hydrocodone for his knee and back pain, Zanaflex for his back pain, and Prozac for depression (R. 292).

Plaintiff's May 3, 2006, right knee MRI showed "[s]mall joint effusion with partial tear of the posterior cruciate ligament. Tear of the anterior horn lateral meniscus with degenerative signal of the posterior horns of the bilateral menisci" (R. 225).

On June 7, 2006, Plaintiff presented to VAMC - Clarksburg with complaints of right knee pain, chronic lower back pain, carpal tunnel syndrome, depression and metabolic syndrome (R. 286, 401). Plaintiff treated his low back pain with hydrocodone, which "appear[ed] to work fairly well for his pain." Plaintiff stated that "physical therapy had helped him more than anything." P.A. Given found Plaintiff's "biggest problem [was] obesity" (R. 287, 401). Plaintiff was instructed to continue wearing the knee brace, medicating his back pain with hydrocodone and Zanaflex, and treating his depression with Prozac (R. 402).

On July 6, 2006, Dr. Peter Cohen, a physician at the Veteran's Administration Medical Center, in Pittsburgh, Pennsylvania ("VAMC – Pittsburgh"), examined Plaintiff for his right knee "popping out of place." Dr. Cohen noted Plaintiff was a "previously healthy male" who experienced knee pain for the past one year. Plaintiff stated he experienced increased right knee pain after he finished physical therapy. Plaintiff stated his knee cap shifted to the right with activity. His wearing a knee sleeve reduced the occurrence (R. 229). Plaintiff reported he worked at Walmart, where he stocked shelves, but he was no longer able to hunt, fish, or go camping due to his knee condition.

Plaintiff reported he medicated with Vicodin, a muscle relaxant, Motrin and Prozac (R. 230).

Plaintiff had full range of motion of his knee, except for extreme flexion. Plaintiff had negative anterior and posterior drawer, negative Lockman's[3] (sic), negative McMurray[4] test, and negative compression test. Dr. Cohen examined x-rays made of Plaintiff's right knee on July 6, 2006. He found no fractures, dislocations or joint changes. Dr. Cohen reviewed a MRI, which showed Plaintiff's ACL and medial and lateral collateral ligaments were intact. Plaintiff elected to treat his knee condition by undergoing a right knee arthroscopy with possible meniscal debridement and possible arthrosporic lateral release (R. 230-31).

Plaintiff presented to VAMC - Clarksburg on August 16, 2006, with complaints of low back pain, which radiated to his right lower leg. He was prescribed Fluoxetine, hydrocodone, and Tizanidine (R. 283, 398).

On October 10, 2006, Plaintiff presented to the VAMC - Clarksburg with low back and right knee pain and was examined by Physician Assistant Mabel Wright. Plaintiff stated his back pain was located "all across the lower back" and it radiated down his right leg and to his foot. He experienced stiffness and weakness in his back. Plaintiff described his back pain as constant and stabbing (R. 252, 355-56). He medicated his back pain with Lortab, ibuprofen and Zanaflex (R. 252-

---

[3]Lachman test: an anterior drawer test for cases of severe knee injury, performed at 20 degrees of flexion. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1916.

[4]McMurray test: (for torn meniscus) the patient lies supine with knee fully flexed and foot flat on the table near the buttocks. The examiner stabilizes the flexion with the thumb and index finger, then holds the heel with the other hand, rotates the patient's foot fully outward, and slowly extends the knee to a 90° angle; a palpable or audible "click," grinding, pain, or limitation of extension indicates a tear of the medial meniscus of the knee joint. The lateral meniscus is tested by repeating the maneuver but rotating the foot inward. *Dorland's Illustrated Medical Dictionary*, 31st Ed., 2007, at 1917.

53, 356). Plaintiff reported his wife has to help him get out of the car after he had worked at Walmart and had to assist him in putting on his shoes, socks, and pants. He experienced pain in his right knee, which became dislocated. Plaintiff used a brace to support his knee (R. 253, 356).

Upon examination, Plaintiff's gait was antalgic; his muscle strength was 5/5 and equal. Plaintiff's knee of range of motion was normal for extension and abnormal for flexion. Plaintiff's low back range of motion was abnormal and lacked repetition. Plaintiff's straight-leg raising test was negative (R. 254, 357). Plaintiff was diagnosed with degenerative disc disease and "partial posterior cruciate ligament tear and the lateral meniscus tear" (R. 255, 358).

On October 18, 2006, Dr. Donald Summers, a clinical psychologist with VAMC - Clarksburg, completed a mental examination of Plaintiff. Plaintiff described himself as "'pretty much a loner.'" Plaintiff's father had committed suicide (R. 243, 271, 347, 385). Plaintiff was an average student (R. 244, 347, 386). Plaintiff reported he was arrested in 2004 and charged with abusing his nieces and nephews. He pled guilty and was placed on probation. Plaintiff had been married for ten years; he stated he had a "great" relationship with his wife and "good" relationships with his step daughters. Plaintiff visited with and was visited by friends (R. 245, 272, 348, 387).

Plaintiff reported he experienced severe and chronic low back pain, right knee pain, dislocation of his right kneecap, and carpal tunnel. He had mood swings and moderate depression with episodes of serious depression. He had been medicating with Prozac, which he did not "'think [was] . . . helping at all'" (R. 246, 273, 349, 388). Plaintiff's speech was unremarkable; his attitude was cooperative and friendly; his affect was serious with "some periods of near tearfulness when discussing his pain and particularly his limitations"; his mood was mildly to moderately depressed and anxious; he was easily distracted; he was oriented, times three; his thought process and content

were unremarkable; he had no delusions; his judgment was normal; his intelligence was average; his insight was normal; his sleep was impaired; he had no hallucinations, inappropriate behavior, obsessive behavior, panic attacks, homicidal thoughts, suicidal thoughts, or episodes of violence (R. 247-48, 274-75, 350-51, 389-90). Plaintiff's remote and immediate memory were normal; his recent memory was mildly impaired (R. 249, 276, 352, 391).

Plaintiff's score on the Beck Depression Inventory was "significantly elevated suggesting at least moderate to serious depression." Plaintiff's score on the Beck Anxiety Index was "within a moderate range with symptoms suggesting nervousness and difficulty relaxing due to physical problems and contributing to depression." The results of Plaintiff's testing was "probably" valid (R. 249, 276, 352, 391). Dr. Summers made the following diagnosis: Axis I – depressive disorder NOS; Axis II – no diagnosis; Axis IV – chronic pain (R. 250, 277, 353, 392). Dr. Summers found there was no "total occupational and social impairment due to mental disorder" (R. 251, 278, 354, 393) He noted Plaintiff's depression was "at least as likely as not due to the low back pain syndrome," which caused a "loss of self-image and led to depression" (R. 251-52, 278-79, 354, 393-94).

On October 25, 2006, Plaintiff presented to VAMC - Clarksburg with complaints of right knee pain, chronic low back pain, obesity and depression. Plaintiff stated his pain had been worsening and was non-radicular. He reported he had not undergone surgery, as recommended, for his knee due to lack of funds. His straight-leg testing was negative; he had no sciatic notch tenderness (R. 267, 382). He was diagnosed with chronic low back pain, on-set hypothyroidism, recurrent right knee pain, obesity, and depression (R. 268, 382-83).

On December 28, 2006, Plaintiff presented to the VAMC - Clarksburg for evaluation of his right knee. Plaintiff stated he had injured his back in 1996 and had received a forty (40) percent back

injury award (R. 240, 344). Plaintiff carried a cane. Plaintiff stated he first experienced right leg pain in 2004, when his knee dislocated when he stood up. Plaintiff exercised regularly and used a knee brace. Dr. Snead noted Plaintiff had difficulty squatting, running or participating in any sports, but "was able" to perform his job of stacking shelves "fairly well" (R. 241, 344).

Upon examination, Plaintiff had full range of motion of his knee (R. 241, 345). Plaintiff had no instability, his anterior and posterior drawer signs were negative, his Lachman's sign was negative, his McMurray's sign was negative, and he had no joint line tenderness. Dr. Snead noted Plaintiff's right knee x-ray was normal, but his MRI showed "some possible cruciate ligament damage and possible meniscal muscle damage." No complete tears were evident. Dr. Snead found no loss of motion of flexion or extension with repetition of Plaintiff's right knee. Dr. Snead diagnosed bulging lumbar disc and recurrent dislocation of right kneecap (R. 242, 345-46).

On December 28, 2006, an x-ray was made of Plaintiff's lumbosacral spine. It showed "[n]o radiological evidence of acute fracture, subluxation or dislocation" (R. 299-300, 406)

On February 12, 2007, an x-ray was made of Plaintiff's right knee. It showed "no evidence of fracture or dislocation." All bones, joints, and soft tissues were intact. There was no evidence of "significant joint effusion" (R. 263, 299, 378, 406).

On February 12, 2007, Physician Assistant Wright examined Plaintiff for left knee pain (R. 260, 375). She noted Plaintiff walked with a cane, was unable to walk for "more than a few yards," and could stand for fifteen-to-thirty minutes. Plaintiff's knee was stiff, it did not lock, and he experienced no weakness (R. 261, 376). P.A. Wright found Plaintiff's "weight-bearing joint" was affected; Plaintiff's gait was antalgic (R. 262, 377). Plaintiff's knee "click[ed] or snap[ped]"; he had no crepitation, grinding, or instability (R. 263, 377).

On April 26, 2007, Plaintiff was treated by Physician Assistant Given, who noted Plaintiff's knee "appear[ed] to be doing relatively well" (R. 259, 374).

On October 26, 2007, Plaintiff was evaluated by Dr. Sandra L. Skar, at VAMC - Clarksburg, for depression. Plaintiff was alert and oriented, times four. His speech was normal; mood was depressed; affect was congruent; memory was grossly intact; concentration and abstract thinking were intact; thought process and content were goal directed; and judgment and insight were good. He had no suicidal or homicidal ideations. Dr. Skar diagnosed depressive disorder, NOS (R. 365).

Also on October 26, 2007, Plaintiff presented to VAMC - Clarksburg with complaints of back pain with radiation to his lower extremity. Plaintiff stated that the pain also radiated to his left groin. Physician Assistant Given noted that Plaintiff's symptoms did not "appear to be associated with any weakness [in] the lower extremities or new paresthesia." Plaintiff reported he had had a "recent lifting injury." Plaintiff's straight leg raising test was positive on the left side and negative on the right side. P.A. Given diagnosed chronic low back pain and prescribed hydrocodone, Zanaflex, and gabapentin (R. 366, 479-80).

An October 26, 2007, x-ray of Plaintiff's hip was normal (R. 405, 443).

On November 5, 2007, Sharon Joseph, Ph.D., completed a Mental Status Exam of Plaintiff. Plaintiff reported he had quit high school after completing the tenth grade and that "he did not get along with the principal." Plaintiff was not enrolled in special education classes; he received Cs and Ds; he obtained his GED (R. 306). Plaintiff reported his past work experience was that of a laborer, telemarketer, and unloader at Walmart. Plaintiff reported he was in the Army National Guard, from which he was honorably discharged in 1998, due to an injury to his back in 1996 (R. 307).

Plaintiff reported he was treated for back pain, depression, right and left knee pain, right and

8

left hand carpal tunnel syndrome, thyroid disorder, and hip pain. He medicated with Vicodin, Motrin, Prozac, Zanaflex, gabapentin, and levothyroxine. Plaintiff did not smoke or drink alcohol. Plaintiff reported he had been treated for depression since 2006 by his primary care physician. He had not been treated by a psychologist, psychiatrist, or therapist (R. 307).

Upon examination, Plaintiff was alert and oriented, times three. He was cooperative (R. 308). Plaintiff's mood was depressed; he admitted he had suicidal ideation without intent or plan; he did not have homicidal ideation; he had no perceptual or thinking disturbances; Plaintiff had no hallucinations, delusions, preoccupations, obsessions, or compulsions. Plaintiff's eye contact was average; speaking speed was normal; content was relevant. Plaintiff's affective expression was anxious and his insight was fair. Plaintiff's immediate memory was normal and his recent memory was mildly impaired. Plaintiff's concentration was moderately impaired; his judgment was normal. Plaintiff stated he experienced mood swings and feelings of low self esteem. His symptoms had once responded to Prozac, but the medication no longer alleviated his symptoms (R. 308).

Plaintiff's activities of daily living were reported as follows: rose at 10:00 a.m., ate breakfast, and took medication. Plaintiff "work[ed] on winterizing a boat" during the afternoons. Plaintiff watched television at night. Plaintiff was able to vacuum, dust, cook, put groceries away (without bending), mop the floor, walk to the mailbox, drive a car, and manage his own finances. Plaintiff stated he did not go up or down steps too often due to pain. Plaintiff was unable to lift "anything" or take out the garbage. Plaintiff was able to remember to turn off the stove. Plaintiff stated it was "difficult in terms of getting chores done around the house because his wife [was] also disabled due to back problems." Plaintiff reported he could no longer hunt or fish, did not belong to any groups, had "a few friends," used the computer, watched movies, and read (R. 308).

Dr. Joseph found Plaintiff's socialization was normal and diagnosed major depression, recurrent, moderate, and pain disorder with both physical and psychological components. Dr. Joseph found Plaintiff's psychological prognosis was "fair" and he could manage benefits (R. 308-09).

On November 7, 2007, Plaintiff presented to Dr. Skar for a psychiatry consultation. Plaintiff stated he had had a "back problem" since 1996, which adversely affected his mood (R. 362, 476). Dr. Skar completed a mental status examination of Plaintiff. She noted he was alert and oriented, times four; his speech was normal; his mood was depressed; his affect was congruent; his memory, concentration, and abstract thinking were intact; his thought process and content were goal directed; his judgment and insight were good (R. 478). Dr. Skar diagnosed depressive disorder, NOS, and prescribed Effexor instead of Prozac as treatment (R. 363, 476).

On November 15, 2007, Dr. Kip Beard completed an Internal Medicine Examination of Plaintiff. Plaintiff's chief complaints were for back pain, knee pain, carpal tunnel syndrome, and thyroid problems. Plaintiff reported he injured his back in 1996. Plaintiff stated x-rays and MRIs showed "T9-T10 rupture, degenerative disk disease, bulges and stenosis in the lower back." Plaintiff stated he treated his back condition with physical therapy, Neurontin, hydrocodone and nerve blocks. Plaintiff stated the medication took "the edge off the pain, but [did] not alleviate it." Plaintiff described his pain as six (6) on a scale of one to ten (1-10). Plaintiff reported his back pain did not radiate. He experienced pain with prolonged sitting, standing, walking and squatting. He could not lift more than fifteen pounds. Plaintiff stated he was diagnosed with carpal tunnel syndrome and had right carpal tunnel release done in 2000. Plaintiff reported he did not realize "much improvement" with the procedure. He experienced numbness, tingling, pain, loss of grip strength in both hands (R. 310). Plaintiff reported he experienced "trouble" with his knees "since the 1990s." Plaintiff reported

that he'd had a MRI of his right knee and "was found to have a torn ligament and was told that the knee was warn (sic) out." Knee surgery was recommended, but, due to Plaintiff's lack of insurance at the time, he could not afford it and, therefore, he did not have it performed. Plaintiff stated he experienced constant pain, dislocation of the right knee cap, and tenderness (R. 311).

Plaintiff's pulmonary, cardiovascular, gastrointestinal, genitourinary, and neurological systems were normal. Plaintiff could ambulate without, but walked with, a cane; his gait was slow. He had mild bilateral limping. Plaintiff had a "mild degree of difficulty arising from a seat and stepping up and down from the examination table." Plaintiff appeared comfortable while seated. Dr. Beard's review of Plaintiff's neck, HEENT, chest, abdomen, extremities, cervical spine, arms, hands, ankles, and feet produced normal results (R. 312-13). Dr. Beard noted Plaintiff experienced "some mild pain with tenderness" in his knees. There "may have been a slight effusion about the right knee." Flexion of both knees was one-hundred, thirty-five (135) degrees, "with normal range of motion otherwise." There was no redness, warmth, or swelling. Plaintiff was positive for bilateral patellofemoral crepitus. Plaintiff complained of moderate pain with motion testing of his lumbosacral spine and hips. Dr. Beard noted there was tenderness. There was no spasm. Plaintiff's range of motion was normal, except flexion was fifty (50) degrees. Plaintiff could stand on one leg at a time. Plaintiff's seated straight leg raising test was ninety (90) degrees, bilaterally. Plaintiff's supine straight leg raising test was seventy (70) degrees, bilaterally, with pain. Plaintiff's hips had normal ranges of motion. Plaintiff's neurologic examination showed no evidence of weakness and intact sensation (R. 313). Plaintiff's deep tendon reflexes were 2+; he could heel walk, toe walk, tandem walk, and squat "about halfway with knee pain" (R. 314). Dr. Beard diagnosed chronic thoracolumbar back pain, bilateral carpal tunnel syndrome, and chronic bilateral knee pain (R. 314).

On November 20, 2007, James W. Bartee, Ph.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Bartee found Plaintiff had impairments that were not severe; specially, Plaintiff had affective disorder and somatoform disorder (R. 316). Dr. Bartee found Plaintiff had mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, mild difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation (R. 326).

On December 5, 2007, Fulvio Franyutti, M.D., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Franyutti found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday, and unlimited push/pull (R. 331). Dr. Franyutti found Plaintiff could occasionally climb ramps, stairs, ladders, ropes, and scaffolds, and balance, stoop, kneel, crouch, and crawl (R. 332). Dr. Franyutti found Plaintiff had no manipulative, visual or communicative limitations (R. 333-34). Dr. Franyutti found Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards; Plaintiff had no limitations regarding his exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation (R. 334). Dr. Franyutti found Plaintiff "appear[ed] to be partially credible" and his "allegations [were] partially supported by findings" (R. 335).

Plaintiff reported to Dr. Skar on December 7, 2007, that he was tolerating Effexor well but it was not ". . . effective for his irritability." Plaintiff was alert and oriented; he had no suicidal or homicidal ideations. His mood was stable, affect was congruent, thoughts were goal directed and insight and judgment were good. Dr. Skar increased Plaintiff's dosage of Effexor (R. 361, 474-75).

On January 11, 2008, Plaintiff presented to Dr. Skar; he was accompanied by his wife, who informed Dr. Skar that she had "noticed an improveemnt (sic) in his [Plaintiff's] self control with

use of effeoxr (sic)." Plaintiff stated his "mood [was] improved, but continue[d] to have significant depressive sx . . . ." He had no suicidal ideation; he was alert and oriented, times four; his mood was stable; he was depressed; his affect was congruent; his thoughts were goal directed; he had no hallucinations, or suicidal or homicidal ideations; his insight and judgment were good. Dr. Skar diagnosed depressive disorder. She increased Plaintiff's Effexor to 50mg (R. 360, 473-74).

On March 20, 2008, Cindy Osborne, D.O., completed a Physical Residual Functional Capacity Assessment of Plaintiff. Dr. Osborne found Plaintiff could occasionally lift and/or carry twenty pounds; frequently lift and/or carry ten pounds; stand and/or walk for a total of about six hours in an eight-hour workday; sit for a total of about six hours in an eight-hour workday; and push/pull unlimited (R. 414). Plaintiff could occasionally climb ramps, stairs, ladders, ropes and scaffolds, and balance, stoop, kneel, crouch, and crawl (R. 415). Plaintiff had no manipulative, visual, or communicative limitations (R. 416-17). Dr. Osborne found Plaintiff should avoid concentrated exposure to extreme cold, vibration, and hazards, and his exposure to extreme heat, wetness, humidity, noise, fumes, odors, dusts, gases, and poor ventilation was unlimited (R. 417). Dr. Osborne opined that Plaintiff was partially credible because his allegations of pain and limitations were "[s]upported by limping gait, ability to ambulate without cane, normal strength, some restricted ROM's (sic), and abnormal MRI's (sic). Not totally consistent with questionaires (sic) which indicated constant pain, partial relief from medication, use of assistive device, and restricted ADL's (sic) due to pain and stiffness. CE report indicated claimant is able to walk without a cane, although his gait is limping." Dr. Osborne reduced Plaintiff's RFC to light (R. 418).

On March 31, 2008, Dr. Philip Comer completed a Mental Residual Functional Capacity Assessment of Plaintiff. He found Plaintiff was not significantly limited in his ability to understand

13

and remember or in his social interaction ability (R. 421-22). Plaintiff was moderately limited in his ability to maintain attention and concentration for extended periods; his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 421-22). Dr. Comer found Plaintiff was moderately limited in his ability to respond appropriately to changes in the work setting (R. 422). Dr. Comer found Plaintiff could work in a low stress, low demand work environment (R. 423).

Also on March 31, 2008, Dr. Comer completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff had affective and somatoform disorders (R. 425). Plaintiff's affective disorder was major depressive disorder, recurring, moderate (R. 428). Plaintiff's somatoform disorder was pain disorder with psychological and medical factors (R. 431). Dr. Comer found Plaintiff had mild limitations in activities of daily living and maintaining social functioning. Dr. Comer found Plaintiff had moderate limitations in maintaining concentration, persistence or pace. Dr. Comer found Plaintiff had experienced one or two episodes of decompensation (R. 435). In making these findings, Dr. Comer relied on the November, 2007, evaluation completed by Dr. Joseph. Dr. Comer noted Dr. Joseph found Plaintiff's mood to be depressed, his affect to be anxious, his immediate memory to be within normal limits, his recent memory to be mildly deficient, his concentration to be moderately impaired, and his social functioning to be normal (R. 437).

On April 17, 2008, Plaintiff presented to Physician Assistant Given with complaints of knee and back pain. Plaintiff stated his "pain control [had] been fair." Plaintiff stated he was applying for Social Security Disability benefits and requested a functional capacity evaluation. P.A. Given

14

diagnosed diffuse arthralgias and referred Plaintiff for a rheumatology evaluation (R. 467-68).

On May 5, 2008, Plaintiff underwent a functional capacity examination at VAMC - Clarksburg for back and knee pain. Plaintiff stated he had applied for Social Security benefits. Physical Therapist Janelle Hineman reviewed Plaintiff's September, 2003, and May, 2006, MRIs. P.T. Hineman noted Plaintiff was in "a sedentary category" and had a high pain profile. Plaintiff's reliability score was sixty (60) percent, which indicated poor effort during the testing (R. 452).

Also on May 5, 2008, Plaintiff reported to Dr. Skar that he felt Effexor was "helpful for his mood, but that his dose may need to be increased" because he continued "to have problems with depressed mood." Plaintiff was alert and oriented, times four. His mood was stable and depressed, affect was congruent, thoughts were goal directed, and insight and judgment were fair. Plaintiff had no suicidal or homicidal ideations. Dr. Skar increased Plaintiff's Effexor to 75mg (R. 462).

On July 10, 2008, Dr. Naveed U. Haque, a rheumatologist at VAMC – Clarksburg, conducted a rheumatology consultation examination of Plaintiff. Plaintiff complained of "generalized body aches and pains and joint pain." Plaintiff stated nothing exacerbated or alleviated his pain. Dr. Haque found Plaintiff's joints were not acute, warm, swollen or tender (R. 526). Dr. Haque noted Plaintiff complained of low back pain. He had no muscle weakness (R. 527). Plaintiff's straight leg raising test was positive and Plaintiff could "flex up to 30 degrees." Dr. Haque found Plaintiff had "physical deconditioning and [chronic] insomnia which are responsible for complaints of aches and pains." Dr. Haque recommended that Plaintiff lose weight and do aerobic exercises (R. 528).

The October 17, 2008, x-rays of Plaintiff's knees were normal, except for a "minor abnormality," namely, a lateral tilt of the patellae of the right knee (R. 488). Plaintiff's right knee MRI was "unremarkable," except for "joint effusion slightly distending the joint capsule laterally

and extending into a small Baker's cyst at the posterior aspect of the knee medially" (R. 490).

On October 17, 2008, Plaintiff was evaluated by Physician Assistant Given. P.A. Given noted Plaintiff had been "seen in . . . rheumatology clinic in July and no systemic connective tissue disorders [had] been identified." Plaintiff reported worsening right knee pain "with an episode of patellar subluxation while camping two weeks" earlier. P. A. Given noted Plaintiff had "marked crepitance with flexion and extension of the right knee," diffuse nonspecific tenderness, and no effusion (R. 518). P.A. Given diagnosed chronic pain syndrome, new onset type II diabetes, chronic low back pain, obesity, depression, hypothyroidism, and recurrent bilateral knee pain and referred Plaintiff to the VAMC - Pittsburgh orthopedic department for reevaluation; (R. 519).

On December 9, 2008, Plaintiff reported to Dr. Skar that he had been "experiencing problems with mood, irritability and depression." He felt Effexor was not effective. Plaintiff's wife stated she thought Plaintiff's depressive symptoms were worsening. Dr. Skar ordered Plaintiff to taper off Effexor and prescribed Cymbalta, 30mg (R. 503).

On January 13, 2009, Plaintiff was evaluated by Dr. Skar. Plaintiff's wife informed Dr. Skar that she thought that Plaintiff was responding well to Cymbalta; it helped his mood, he smiled at her more, and he was more interactive with her. Plaintiff stated his mood was "'not worse'" now that he medicated with Cymbalta. Plaintiff was alert and oriented, times four; his mood was stable and depressed; his affect was "slight brightening"; his insight and judgment were good; and his thoughts were goal directed. Dr. Skar increased Plaintiff's dose of Cymbalta to 60mg (R. 502).

On March 12, 2009, Dr. Skar treated Plaintiff for depression. Plaintiff continued medicating with Cymbalta and was "'not as agitated.'" Plaintiff stated the increase in the medication was "'working better'"; however he "continue[d] to ascribe to depressed mood" and had "problems" with

16

anger, irritability, focus, attention, and social interactions. Plaintiff stated he could not "stand to be around a lot of people" because he would get "shaky and everything." Upon examination, Dr. Skar found Plaintiff was alert and oriented, times four, and had depressed mood and congruent affect. Plaintiff's thoughts were goal directed. She diagnosed depressive disorder, secondary to chronic pain. Dr. Skar instructed Plaintiff to continue treating his depression with Cymbalta, 60mg. Dr. Skar noted Plaintiff continued to "ascribe to significant depressive" symptoms "in association with his medical illness, which would preclude his ability to be employed" (R. 538). <u>Administrative Hearing</u>

Plaintiff testified at the administrative hearing that he attributed his weight gain to his medication and the fact that he was sedentary (R. 24). His back pain "basically hinder[ed] [him] from doing everything" (R. 35). Plaintiff testified his pain was constant and shooting. He had not had surgery on his right knee and that it would dislocate (R. 36). His left knee had started hurting (R. 38). Plaintiff stated it was difficult to "keep a thought process going" due to his pain and depression (R. 47). He walked with a cane (R. 49). Plaintiff testified he had received injections in his back, which did not relieve his pain. Plaintiff stated he had one good day per month (R. 50).

Plaintiff testified he drove twice weekly. He drove his wife to Walmart, but he did not shop. Plaintiff sat on a bench because he was unable to walk through the store (R. 27). Plaintiff stated he rose at 6:00 a.m. and "basically just [sat] there and watch[ed]" his daughters as they prepared to go to school (R. 38). After his daughters departed for school, Plaintiff lay down again and slept until 9:00 a.m. Plaintiff's wife prepared his breakfast. Plaintiff's wife administered his medications because he did not "remember what doses [he took]" (R. 39). Plaintiff testified he did not like to be around people and would rather be "off by" himself (R. 40). He watched television. He no longer

17

hunted or fished (R. 42). He could walk seventy-five (75) yards before he had to stop due to knee and back pain. He could stand for a "few minutes" before his knees and back began to hurt. Plaintiff stated he changed positions while seated (R. 43). Plaintiff could sit for ten-to-fifteen (10-15) minutes, then his back became stiff and painful (R. 44). Plaintiff could lift a gallon of milk. Plaintiff had no hobbies, did not do vehicle maintenance on his cars, belonged to no groups or organizations, did not drink and did not smoke (R. 45). He could dress himself, but, occasionally, someone had to tie his shoes. He could not attend his daughters' school sport events because he could not sit. Plaintiff did not pay bills; his wife did. Plaintiff used a computer (R. 46). Plaintiff testified he could not visit his mother, who lived in Ohio, because he could not "ride that far" (R. 47).

Plaintiff testified he had been receiving disability compensation from the Veterans' Administration since 1998, and the amount of that compensation had not increased (R. 27-28).

The ALJ asked the VE the following hypothetical question:

> I want you to assume that the claimant would be limited to doing light work, only occasional balancing, stooping, kneeling, crouching, and occasional climbing of ramps and stairs. No climbing of ladders, ropes, or scaffolds. He wouldn't be able to work at unprotected heights or around dangerous moving machinery, would be limited to no jobs that required work in extreme cold temperatures for long periods of time, which I'll define as an hour or more, or for work that required operation of equipment that caused high amounts of vibration to the individual. Would the claimant be able to do any of his past relevant work with those limitations? (R. 55).

The VE responded that Plaintiff could work as a telephone solicitor (R. 55).

The ALJ then asked,

> All right, I want you to, with respect to the light work, I'm going to add an additional limitation that the individual would be limited to jobs that would not require high production rates, such as assembly line work or high sales quotas, such as telemarketing sales jobs. With that additional limitation, would the claimant be able to do any of his past relevant work? (R. 46).

The VE responded in the negative; however, the VE testified that there was work in the national and local economy that Plaintiff could perform with those limitations. The VE testified that Plaintiff could do the job of office helper with eighty-five (85) jobs in the local economy and 86,283 jobs in the national economies; marker with two-hundred and forty-seven (247) jobs in the local economy and 250,209 jobs in the national economy; business mail clerk with sixty-one (61) jobs in the local economy and 70,832 jobs in the national economy (R. 56).

The ALJ then asked the VE the following question:

> . . . I want you to assume a hypothetical individual, the same age, education, and work experience as the claimant, with the limitations I gave you in the previous question, but with an additional limitation. The individual could stand or walk for six hours in an eight-hour work day, but couldn't stand or walk for more than half an hour at a time, and then would have to sit down for a few minutes, could sit for six hours in an eight hour work day, but would have to be able to stand up or move around for a few minutes after sitting for half hour at a time. With that additional limitation, would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy at the light level? And if the jobs that you previously gave me you think still are applicable, you can just tell me that (R. 57-58).

The VE responded that the jobs of office helper and mail clerk would be applicable but the marker job would not. The VE stated that the job of storage facility rental clerk would be available to the hypothetical person with those limitations. There were one-hundred and eighty-five (185) jobs in the local and 179,260 jobs in the national economies (R. 58).

The ALJ then asked the VE the following:

> . . . [A]ssume a hypothetical individual, the same age, education and work experience as the claimant, that would be limited to doing sedentary work, with the ability, if seated, to change position about once every half hour for a few minutes, could stand and could sit for at lest six hours in an eight hour work day, could stand or walk for at least two hours in an eight hour workday, but wouldn't be able to stand or walk for more than about 15 minutes at a time and then would have to sit down for a few minutes. And with the other non-exertional limitations in the previous hypothetical, would there be any full time, unskilled jobs such a hypothetical person could do in the local or national economy at the sedentary level? (R. 59).

The VE responded that there would be the jobs of surveillance system monitor with sixteen (16) jobs in the local and 25,366 jobs in the national economies; document preparer with two-hundred and seven (207) jobs in the local and 143,297 jobs in the national economies; and ampoule sealer with twenty (20) jobs in the local and 32,278 jobs in the national economies (R. 59).

The ALJ then asked the VE to "assume a hypothetical individual, the same age, education and work experience as the claimant that could do lighter sedentary work. But due to the individual's impairments, he would be off task, two hour (sic) out of an eight hour work day. Would there be any full-time, unskilled jobs such a hypothetical person could do in the local or national economy, with those limitations?" The VE responded there were no jobs (R. 59).

The ALJ then asked the VE if an "individual could do light or sedentary work . . . [b]ut due to the individual's impairments, he'd be absent from work three days a month on an ongoing basis. Would there be any full-time, unskilled jobs such a hypothetical person could do . . . ?" The VE responded there would be no jobs (R. 59-60).

### III.  ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 404.1520 (2000), ALJ Moon made the following findings:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2011 (R. 11).

2.   The claimant has not engaged in substantial gainful activity since January 31, 2007, the alleged onset date. (20 CFR 404.1571 *et seq.*) (R. 11).

3.   Since January 31, 2007, the claimant has had the following medically determinable impairments that, either individually or in combination, are "severe" and have significantly limited his ability to perform basic work activities for a period of at least 12 consecutive months: degenerative disc disease in the lumbar spine; degenerative changes in the right knee; obesity;

diabetes; pain disorder with both physical and psychological components; and depression. (20 CFR 404.1520(c)) (R. 11).

4.  Since January 31, 2007, the claimant has had no medically determinable impairments, whether considered individually or in combination, that have met or medically equaled the severity criteria for any of the listed impairments in Appendix 1, Subpart P, Regulation #4 (20 CFR 404.1520(d), 404.1521, 404.1526, 416.920(d), 416.925 and 416.926)(R. 11-12).

5.  Since January 31, 2007, the claimant has had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) that: requires standing and walking no more than six hours out of an eight hour day, but for only 30 minutes at a time before needing to sit for a few minutes, and sitting for no more than six hours out of an eight hour day, but only for 30 minutes at a time before needing to stand and move for a few minutes; requires no climbing of ladders, ropes or scaffolds, or more than occasional performance of other postural movements (i.e. climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling); avoids hazards such as unprotected heights and dangerous moving machinery; avoids exposure to extremely cold temperatures for more than an hour; avoids high amounts of vibration; and requires no high production rates such as found in assembly line work or high sales volumes such as found in telemarketing (R. 13).

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565) (R. 15).

7.  The claimant was born on November 21, 1968, and was 38 years old on the alleged disability onset date, which is defined for decisional purposes as a younger individual age 18-49. (20 CFR 404.1563) (R. 16).

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564) (R. 16).

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2) (R. 16).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569a) (R. 16).

11. The claimant has not been under a disability, as defined in the Social Security Act, from January 31, 2007, through the date of this decision (20 CFR 404.1520(g)) (R. 17).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). The Fourth Circuit held, "Our scope of review is specific and narrow. We do not conduct a de novo review of the evidence, and the Secretary's finding of non-disability is to be upheld, even if the court disagrees, so long as it is supported by substantial evidence." *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir.1986). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'" *Hays*, 907 F.2d at 1456 (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties[5]

Plaintiff contends:[6]

1.    The Commissioner erred as a matter of law by discounting the Plaintiff's
      credibility without providing specific reasons supported by the evidence in
      the case record (Plaintiff's brief at p. 5).

2.    The Commissioner erred as a matter of law by finding that the Plaintiff is
      capable of work that exists in substantial numbers in the national economy
      (Plaintiff's brief at p. 6).

The Commissioner contends:

1.    Substantial evidence supports the ALJ's evaluation of Plaintiff's credibility
      (Defendant's brief at p. 9).

---

[5]Local Rule of Civil Procedure 9.02 (g), mandates the following: "References to the Administrative Record: Claims or contentions by the plaintiff alleging deficiencies in the Administrative Law Judge's (ALJ) consideration of claims or alleging mistaken conclusions of fact or law and contentions . . . **must include a specific reference, by page number, to the portion of the record** that (1) recites the ALJ's consideration or conclusion and (2) supports the party's claims, contentions or arguments." In his Memorandum in Support of Motion for Summary Judgment, Plaintiff failed to reference any page number within the administrative record that supported his allegations of error by the ALJ. Plaintiff also failed to name specific evidence which supported his argument. No specific medical records, physicians or psychologists, testimony, or evidence were identified in his brief. Finally, Section E of Plaintiff's Memorandum in Support of Motion for Summary Judgment is an almost-verbatim copy of his brief to the Appeals Council (R. 219-221).

[6]In Plaintiff's Memorandum in Support of Motion for Summary Judgment, he listed, on page two (2), the following three (3) errors he alleged the ALJ made: 1) "[w]hether the Commissioner erred as a mater of law by finding that the plaintiff is capable of work that exists in substantial numbers in the national economy"; 2) "[w]hether the Commissioner erred as a matter of law by discounting the Plaintiff's credibility without providing specific reasons supported by the evidence in the case record" ; and 3) "[w]hether the Commissioner erred as a matter of law by failing to give appropriate weight to his degenerative disc disease in the lumbar spine; degenerative changes in the right knee; his diagnosis of diabetes; his depression; and his pain disorder with both physical and psychological components." Plaintiff, however, only addressed the issues of the ALJ's credibility finding and his hypothetical question to the VE in his brief. The undersigned, therefore, finds the Plaintiff abandoned the contention as to alleged error on the part of the Commissioner regarding the weight the ALJ assigned to the medical evidence and does not address it in this Report and Recommendation.

2. Substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity and the ALJ's formulation of the hypothetical question to the vocational expert (Defendant's brief at p. 13).

## C. Credibility

In his brief, Plaintiff limits his argument relative to the credibility finding by the ALJ to only his back pain and asserts that the ALJ erred in finding Plaintiff was not entirely credible because his finding, that Plaintiff had "worked from 1996-2007 and that there was 'nothing in the record to show any objective change in the claimant's back condition since his injury in 1996 and since his last objective study in 2003, and nothing objective to support the claimant's testimony that his back pain has increased in frequency and intensity . . .,'" was "insufficient . . . ." Additionally, Plaintiff asserts that the ALJ "ignore[d] his duty to consider the consistency of [Plaintiff's] statements" (Plaintiff's brief at pp. 5 and 6). Defendant asserts the ALJ "properly considered the objective medical evidence, the medical opinion evidence, and Plaintiff's activities in finding Plaintiff's statements about his symptoms partially credible" (Defendant's brief at p. 9). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (1984) (citing *Tyler v. Weinberger*, 409 F.Supp. 776 (E.D.Va. 1976).

In his decision, the ALJ made the following notation and findings as to Plaintiff's back pain:

The claimant testified that he has constant pain in his low back radiating down his legs . . . . He testified that he has two bad days a week with the pain that is so bad that he cannot get out of bed other than to crawl to the bathroom. . . . The claimant testified that he uses a cane to walk everywhere except in his house (R. 13-4).

The claimant's statements are not fully credible because they are inconsistent with the objective medical evidence, inconsistent with the functional capacity evaluation, and inconsistent with the claimant's activities. Turning first to the objective medical evidence, there is little evidence of any change in the claimant's condition from what

it was when the claimant was working. The claimant injured his back in 1996, and it is reported that the most recent MRI in 2003 revealed degenerative disc disease and disc dessication with a small disc herniation at L5-S1 without radiculopathy. (Exhibit 3F). From 1996 to 2007, the claimant worked consistently in the military, at a lumbar yard, as a telemarketer, as an equipment manager, and as a stocker with his back condition. There is nothing in the record to show any objective change in the claimant's back condition since his injury in 1996 and since his last objective study in 2003, and nothing objective to support the claimant's testimony that his back pain has increased in frequency and intensity. (Exhibit 2F, 3F, 5F, 8F, 12F, 14F, 15F). The claimant applied for an increased rating through the VA for his back injury in 2006, but according to the claimant's testimony, his rating has not increased since his award in 1998, again indicating no change in the claimant's lumbar spine condition. (Exhibit 3F). In July 2008, the claimant was evaluated by a rheumatologist who concluded that physical deconditioning and chronic insomnia was responsible for the claimant's various aches and pains, and advised regular exercise. (Exhibit 14F). (R. 14).

As Plaintiff notes in his brief, the ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony." See *DeLoatche v. Heckler*, 715 F.2d 148, 150-51 (4th Cir. 1983); see also *Hammond v. Heckler*, 765 F.2d 424, 426 (4th Cir. 1985). Additionally, 20 C.F.R. 404.1529(c) mandates that the ALJ may consider the medical evidence, including objective findings and opinion evidence, as well as a claimant's daily activities, in assessing claimant's credibility. In the instant case, the ALJ fully explained his determination relative to Plaintiff's credibility. In making that determination, the ALJ considered and evaluated the objective findings and opinion evidence of record.

As noted in the above recitation of the ALJ's decision, the ALJ thoroughly weighed and considered the medical tests, the opinions of the doctors who treated Plaintiff at VAMCs, the opinion of Dr. Beard, and the opinions of two state agency physicians in determining Plaintiff's credibility.

In addition to considering and evaluating the results of the 2003 low back MRI, which showed degenerative disc disease and "dessication with a small disc herniation at L5-S1 without

radiculopathy," the ALJ, in his decision, also considered and evaluated Exhibits 3F, 8F, and 12F, which contain the December 28, 2006, x-ray of Plaintiff's lumbosacral spine, which showed no abnormalities and "preservation of intervertebral disk space, height and alignment," and an October 26, 2007, x-ray of Plaintiff's hip, which was normal (R. 14, 299-300, 406-07, 405, 443).

The ALJ also considered the opinions of the doctors who treated Plaintiff at VAMC – Clarksburg and Pittsburgh and the findings of Dr. Beard, who completed a consultative internal medical examination of Plaintiff.

On October 10, 2006, Physician Assistant Wright found Plaintiff's gait was antalgic, but his muscle strength was 5/5 and equal. Plaintiff's low back range of motion was abnormal in that it lacked repetition, but his straight leg raising test was normal (R. 14, 254, 357). The ALJ evaluated the October 25, 2006, medical evidence from VAMC – Clarksburg, which showed Plaintiff's back pain was non-radicular, his straight leg raising test was normal, and he had no sciatic notch tenderness (R. 14, 267, 382). The ALJ considered the December 28, 2006, opinion of Dr. Snead that Plaintiff "was able" to perform his job of stacking shelves "fairly well" (R. 14, 241, 344). The ALJ evaluated the October 26, 2007, treatment notes of Physician Assistant Given. Plaintiff complained of low back pain, which radiated to his groin. Plaintiff reported he had experienced a "recent lifting injury." P.A. Given noted that the symptoms did not "appear to be associated with any weakness [in] the lower extremities or new paresthesia." Plaintiff's right straight leg raising test positive; his left straight leg raising test was negative (R. 14, 366, 479-80). Dr. Haque, a rheumatologist at VAMC – Clarksburg, found Plaintiff's joints were not acute, warm, swollen or tender (R. 14, 526). He had no muscle weakness (R. 14, 527). Dr. Haque opined that Plaintiff had no evidence of a "systemic connective tissue disorder"; had "physical deconditioning and [chronic] insomnia which

26

are responsible for complaints of aches and pains"; and should lose weight and do aerobic exercises (R. 14, 528). Additionally, the ALJ gave significant weight to the opinion contained in the May 5, 2008, functional capacity examination completed at VAMC – Clarksburg. Physical Therapist Hineman found Plaintiff was capable of sedentary work even though his effort during testing was poor (R. 15, 452).

The ALJ considered Dr. Beard's findings, which showed that Plaintiff could ambulate without a cane, but did walk with one; had a "mild degree of difficulty arising from a seat and stepping up and down from the examination table"; was comfortable while seated; and complained of moderate pain with motion testing of his lumbosacral spine and hips. Dr. Beard found Plaintiff's low back was positive for tenderness but no spasm. Plaintiff's ranges of motion were normal, except for flexion at fifty (50) degrees. Plaintiff could stand on one leg at a time. Plaintiff's straight leg raising test was ninety (90) degrees, bilaterally; his supine straight leg raising test was seventy (70) degrees, bilaterally. He had normal range of motion in his hips. His neurologic exam showed no weakness and intact sensation. He could heel walk, toe walk, and tandem walk (R. 14, 313-14).

The ALJ also gave significant weight to the opinions of the state agency physicians (R. 15). 20 CFR § 404.1527(f)(2)(I) provides:

> Administrative law judges are not bound by any findings made by [s]tate agency medical or psychological consultants, or other program physicians or psychologists. However, [s]tate agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of [s]tate agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

On December 5, 2007, Dr. Franyutti found Plaintiff "appear[ed] to be partially credible" and his

"allegations [were] partially supported by findings" (R. 15, 335). On March 20, 2008, Dr. Osborne found Plaintiff was partially credible because his allegations of pain and limitations were "[s]upported by limping gait, ability to ambulate without cane, normal strength, some restricted ROM's (sic), and abnormal MRI's (sic). Not totally consistent with questionaires (sic) which indicated constant pain, partial relief from medication, use of assistive device, and restricted ADL's (sic) due to pain and stiffness." Dr. Osborne reduced Plaintiff's RFC to light (R. 15, 418).

The above objective findings and opinion evidence, which were evaluated and weighed by the ALJ, support his decision that Plaintiff was not entirely credible.

As to the consistency of Plaintiff's statements about his pain and limitations, Plaintiff asserts that, "[i]n the case at hand, the record provides ample documentation of consistent statements made by the claimant regarding the increasing intensity, frequency, and duration of his back pain . . . " (Plaintiff's brief at p. 6). S.S.R. 96-7p holds:

> One strong indication of the credibility of an individual's statements is their (sic) consistency, both internally and with other information in the case record. The adjudicator must consider such factors as:
>                            . . .
> The consistency of the individual's own statements. The adjudicator must compare statements made by the individual in connection with his or her claim for disability benefits with statements he or she made under other circumstances, when such information is in the case record. Especially important are statements made to treating or examining medical sources and to the "other sources" defined in 20 CFR 404.1513(e) and 416.913(e). . . .

The undersigned finds that ALJ did not err in his evaluation of Plaintiff's statements as to his pain and limitations. A review of the ALJ's decision, as well as the record, indicates that Plaintiff's statements were not consistent with other statements made by him and with statements made by providers. The ALJ noted that the Plaintiff testified at the administrative hearing that he

28

had "two bad days a week with the pain that is so bad that he cannot get out of bed other than to crawl to the bathroom" and that he used "a cane to walk everywhere except in his house" (R. 13-14). The ALJ then found the following:

> The claimant reports that his activities are limited, but the claimant is able to vacuum, dust, cook, mop the floor, drive, care for most of his personal needs, and help with child care and the general running of the household along with his disabled wife. (Exhibit 4E, 5E, 4F). He also stated that he isn't able to participate in his hobbies of hunting, fishing, and camping, but the medical evidence indicates that the claimant has been camping as recently as October 2008. (Exhibit 4E, 14F). Although the claimant reports that he has to use his cane any time he leaves his house, the undersigned finds that the claimant is capable of standing and walking without it based on the opinion of the consultative examiner. (Exhibit 5F) (R. 15).

The ALJ's finding that Plaintiff's statements are inconsistent is supported by substantial evidence. Plaintiff stated he rose with his daughters on school days and supervised their preparing for school (R. 15, 38). Plaintiff informed Dr. Joseph, on November 5, 2007, that he could vacuum, dust, cook, put away groceries, mop the floor, drive a car, and walk to the mailbox. In his September 6, 2007, Function Report, however, Plaintiff wrote that he could not stand long enough to cook and that it took him ten (10) minutes to vacuum one room (R. 164). Even though Plaintiff stated that he could no longer hunt or fish, he told Dr. Joseph that he had been spending his afternoons "winterizing a boat" (R. 15, 308). Additionally, Plaintiff told Dr. Cohen, on July 6, 2006, that he could no longer camp, he reported to Physician Assistant Given, on October 17, 2008, that he had been camping "two weeks" earlier (R. 15, 230, 518).

In his September 6, 2007, Personal Pain Questionnaire, Plaintiff did not assert that he had two "bad days a week with the pain that is so bad that he cannot get out of bed other than to crawl to the bathroom" (R. 13-14). Plaintiff reported in that questionnaire that his back pain never completely went away and it made it "hard to get out of bed, walk, stand, sit or stay in one position

29

for very long." Plaintiff's back pain made it difficult for him to "do everything [he] used to do" (R. 170). On October 10, 2006, Plaintiff stated his wife had to occasionally assist him in putting on his shoes, socks and pants and assisted him in getting out of the car after he drove home from his job at Walmart (R. 253, 356).

The ALJ thoroughly considered the November 15, 2007, evidence of Dr. Beard, who noted that Plaintiff reported the medication he took for his low back pain took "the edge off . . . but [did] not alleviate it." Plaintiff rated his back pain as six on a scale of one-to-ten. Even though Plaintiff reported on other occasions and to other physicians and medical staff that his back pain radiated, Plaintiff reported to Dr. Beard his back pain did not (R. 15, 252, 283, 310, 355-56, 366, 398, 479). As noted by the ALJ, Plaintiff stated he walked with a cane when he left his house; however, the evidence submitted by Dr. Beard contained notations that Plaintiff could walk without a cane. Plaintiff appeared comfortable while seated, he had only "mild" difficulty in rising from and stepping down from the examination table, he could stand on one leg at a time, and he could heel walk, toe walk, and tandem walk (R. 15, 312-14).

Additionally, the record contains the June 7, 2006, statement by Plaintiff to Physician Given that hydrocodone "work[ed] fairly well for his pain" and that physical therapy "helped him more than anything" (R. 287, 401). In July, 2006, Plaintiff continued to work at Walmart, where he stocked shelves (R. 230). In October, 2006, Plaintiff reported that his low back pain caused stiffness and weakness; however, examination of his back showed no weakness and a negative straight leg raising test (R. 252, 254, 355-56, 357). On October 26, 2007, Plaintiff reported to Physician Assistant Given that he had injured his back by "lifting"; P.A. Given noted no weakness in Plaintiff's back (R. 366, 479, 80). Plaintiff reported to P.A. Given, on April 17, 2008, that his "pain control [had] been fair" (R. 467-68).

The ALJ properly considered and weighed all relevant evidence in forming his opinion regarding Plaintiff's credibility. The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was only partially credible.

### D. Hypothetical

Sans the recitation of case law relative to a proper hypothetical, Plaintiff's entire argument as to the ALJ's question to the VE is as follows:

> In the case at hand, the ALJ proposed a series of hypothetical questions to the vocational expert to determine if there were a significant number of jobs in the national economy which the claimant could perform with restrictions identified by the judge. In large part due to failure to give appropriate weight to the medical evidence and to improper discounting of the claimant's credibility, however, the ALJ failed to adequately include the limitations presented by the claimant's impairments in hypotheticals to the VE. The vocational expert identified several jobs that the claimant could perform which existed in significant numbers in the national economy in response to the ALJ's flawed hypotheticals (Plaintiff's brief at p. 7).

> In his decision, however, the ALJ failed to give proper weight to the testimony of the claimant and to the medical evidence. Accordingly, the ALJ did not pose appropriate questions to the VE regarding how his pain would affect the claimant's ability to maintain concentration, persistence, and pace on the job. When appropriate questions were asked of the VE (sic) his testimony was clear – if the claimant's pain was as frequent, intense as he testified, he would be "off task" at work beyond acceptable tolerances. As a result of exceeding these tolerances, the VE responded that all jobs would be eliminated (Plaintiff's brief at p. 7).

As detailed above, Plaintiff argues that the ALJ failed to ask an appropriate hypothetical question to the VE that included "how [Plaintiff's] pain would affect [his] ability to maintain concentration, persistence and pace on the job" (Plaintiff's brief at p. 7). Defendant asserts substantial evidence supports the ALJ's assessment of Plaintiff's residual functional capacity and the ALJ's formulation of the hypothetical question to the VE (Defendant's brief at p. 13). The undersigned finds the ALJ made a thorough analysis of the medical evidence as to Plaintiff's ability

to maintain concentration, persistence and pace, and included only those limitations that were supported by the record of evidence. Further, as the undersigned has already found, substantial evidence supports the ALJ's determination that Plaintiff's complaints of pain and limitation were not entirely credible.

The Fourth Circuit has held, in *Koonce v. Apfel*, 166 F.3d 1209 (1999), that the ALJ has "great latitude in posing hypothetical questions" and need only include limitations that are supported by substantial evidence in the record. "For vocational expert's opinion to be relevant or helpful in disability benefits proceeding, it must be based upon consideration of all other evidence in record and must be in response to proper hypothetical questions which fairly set out all of claimant's impairments." *Walker v. Bowen*, 876 F.2d 1097, 1101 (4th Cir. 1989).

In his decision, the ALJ made the following finding:

> With regard to concentration, persistence or pace, the claimant has moderate difficulties. Although the undersigned does not find the claimant's testimony fully credible . . ., the claimant has reported difficulty concentrating and staying on task due both to pain and to depression symptoms. This finding is consistent with the State Agency findings and the opinion of the consultative examiner. (Exhibit 4F, 11F). Accordingly, the undersigned finds that the claimant has a moderate mental limitation in this area (R. 12).

> The claimant . . . began treatment with his primary care physician in 2006 for depression related to his physical impairments, with symptoms of sadness, social isolation, mood swings, inability to sustain concentration and irritability. (Exhibit 3F, 8F, 12F, 14F, 15F). Medication was not fully controlling his symptoms, and in November 2007, the claimant was referred for a psychiatric consult and treatment in the mental health clinic. (Exhibit 8F). The consultative examiner diagnosed major depression, recurrent, moderate and pain disorder with both physical and psychological components, indicating that the claimant's depression is related to his pain disorder but is significant enough to be considered a major disorder. (Exhibit 4F). The claimant has been treated with medications with some success in reducing his symptoms. (Exhibit 8F, 14F, 15F) (R. 15).

As noted above, the ALJ based his finding on the medical evidence from medical providers

at VAMC – Clarksburg and, more specifically, on the opinions of Dr. Joseph, a consultative psychologist, and Dr. Comer, a state-agency psychologist, who found Plaintiff's limitations as to concentration, persistence and pace were moderate.

On October 18, 2006, Plaintiff reported to Dr. Summers, a psychologist at VAMC – Clarksburg, that he had mood swings and moderate depression (R. 15, 249, 276, 352, 391). A year later, on October 26, 2007, Dr. Skar noted Plaintiff's concentration was intact (R. 15, 365). Dr. Skar again found Plaintiff's concentration was intact on November 7, 2007. She prescribed Effexor (R. 15, 478). Dr. Skar increased Plaintiff's dosage of Effexor on December 7, 2007 (R. 15, 361, 474-75). Plaintiff's wife reported to Dr. Skar on January 11, 2008, that she had "noticed" improvement of Plaintiff's self control with the use of Effexor. His mood was stable; his thoughts were goal directed. Dr. Skar again increased Plaintiff's dosage of Effexor (R. 15, 360, 473-74). Dr. Skar increased Plaintiff's Effexor dosage on May 5, 2008. Plaintiff reported the medication was "helpful for his mood" (R. 15, 462). On December 9, 2008, Dr. Skar discontinued treating Plaintiff with Effexor and prescribed Cymbalta because Plaintiff reported Effexor was not effective and his depressive symptoms were worsening (R. 15, 503). Plaintiff reported to Dr. Skar on January 13, 2009, that he was responding well to Cymbalta; it helped improve his mood. Dr. Skar increased Plaintiff's dosage of Cymbalta (R. 15, 502). On March 12, 2009, Plaintiff reported he was not agitated and Cymbalta was "working better" (R. 15, 538).

In addition to the opinions and findings of Drs. Summers and Skar, the ALJ considered the November 5, 2007, opinion of Dr. Joseph, the consultative examiner, who found Plaintiff's concentration was moderately impaired (R. 15, 308). The ALJ gave significant weight to the March 31, 2008, opinions of Dr. Comer, a state agency psychologist, who found Plaintiff was moderately

limited in his ability to maintain concentration, persistence or pace and could work in a low stress, low demand work environment (R. 15, 423, 435).

Despite Plaintiff's assertion that the ALJ did not include any limitation in his hypothetical question to the VE for Plaintiff's moderate limitation as to concentration, persistence or pace, the ALJ actually did ask hypothetical questions that contained limitations for mental impairments that were supported by the record of evidence. To accommodate Plaintiff's moderate limitation in maintaining concentration, persistence or pace and need to work in a low stress, low demand work environment, the ALJ limited Plaintiff to "jobs that would not require high production rates, such as assembly line work or high sales quotas, such as telemarketing sales jobs"(R. 46). In conjunction with the those limitations, the ALJ included postural, environmental and the following exertional limitations to accommodate Plaintiff's back pain in his hypothetical questions to the VE:

> The individual could stand or walk for six hours in an eight-hour work day, but couldn't stand or walk for more than half an hour at a time, and then would have to sit down for a few minutes, could sit for six hours in an eight hour work day, but would have to be able to stand up or move around for a few minutes after sitting for half hour at a time (R. 57-58).

The VE, based on these limitations, testified that a significant number of jobs existed in the local and national economies that Plaintiff could do.

For all the above reasons, the undersigned finds substantial evidence supports the ALJ's hypothetical questions to the VE and his reliance on the VE's testimony in response to those hypotheticals.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's applications for DIB is supported by substantial evidence. I accordingly recommend the Defendant's

Motion for Summary Judgment be **GRANTED,** and the Plaintiff's Motion for Summary Judgment be **DENIED** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable John Preston Bailey, United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); *United States v. Schronce,* 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); *Wright v. Collins,* 766 F.2d 841 (4th Cir. 1985); *Thomas v. Arn,* 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this _27_ day of _June_ , 2011.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE

35